EXHIBIT B TO DECLARATION OF JOHN SIMS

Michael C. Geraghty
EMAIL: geraghty@oles.com
DIRECT PHONE: (907) 258-0712

RECEIVED
JAN 09 2019
Landye Bennett
Blumstein LLP

January 8, 2019

Adolf Zeman, Jr.
Landye Bennett Blumstein, LLP
701 W. 8th Ave., Suite 1200
Anchorage, AK 99501

Dear Adolf:

While ARRC remains willing and committed to meeting with Enstar and its representatives, for purposes of informing our discussion I thought I would take this opportunity to provide you and your clients some background about the Railroad's right-of-way ("ROW").

The Alaska Railroad is the only commercial railroad ever constructed, owned and operated by the federal government. Accordingly, its establishment and eventual transfer to the State of Alaska is unique.

At the turn of the last century, several privately-owned railroads were built and operated in the Territory of Alaska, but these railroads ultimately failed or faced ruinous financial circumstances. The federal government observed these difficulties from a distance, but recognized that rail service would be important to the development of the Territory and Congress eventually passed legislation authorizing the creation of a federally-owned and operated railroad in Alaska: The Act of March 12, 1914 ("Act"). Besides authorizing the President to take a broad range of actions to construct, own and operate a railroad, the Act also authorized the federal government to purchase or otherwise acquire all real and personal property necessary to carry out the purposes of the Act, including the acquisition of all rights-of-way, terminal grounds and necessary appurtenances.

> Terminal and station grounds and rights-of -way through the lands of the United States and the Territory of Alaska are hereby granted for the construction of railroads, telegraph and telephone lines authorized by this Act, and in all patents for lands hereafter taken up, entered or located in the Territory of Alaska there shall be expressed that there is reserved to the United States a right-of-way for the construction of railroads, telegraph and telephone

>lines to the extent of 100 feet of either side of the center line of any such roads. . . .[1]

Construction commenced on the railroad in 1915, and the "golden spike" was driven by President Harding in Nenana in July 1923.

For the next several decades, the federal government owned, and the U.S. Department of Transportation operated, the Alaska Railroad, moving freight and passengers between Seward, Anchorage and Fairbanks.

## The Alaska Railroad Transfer Act ("ARTA")

By the early 1980's, the federal government began discussing the concept of transferring the Alaska Railroad to another entity, and the State of Alaska was an obvious choice. In 1982, legislation was introduced in Congress authorizing the transfer of the Alaska Railroad, including all of its real and personal property, to the state. As the proposed legislation worked its way through Congress, one key issue was the appropriate level of title to convey in connection with the Railroad ROW and other lands that would be transferred to the state.

There was general agreement that most of the federally-owned Alaska Railroad, including its ROW, was held in fee simple title by the U.S., and that most land therefore would be transferred to the state in fee simple. It was also recognized, however, that some of these lands were subject to third-party claims, including claims by native groups and individuals under ANCSA[2] and claims of other third-parties, such as those holding homestead patents.

While ARTA set forth a detailed process for resolving such third-party claims, Congress also recognized that it was critical for the U.S. to provide the state with exclusive control of the ROW. This was regarded as fundamental to the state's ability to maintain and operate a safe and economical railroad. Consequently, an "exclusive use easement," was developed "to ensure that the state-owned railroad would receive exclusive and complete control over land traversed by the right-of-way."[3]

ARTA was enacted on January 14, 1983. It provides detailed procedures governing the transfer of the Alaska Railroad from federal to state ownership. Several provisions relate to transfer of real property, the type of conveyances to be used for that transfer and the nature of the title to be conveyed. Simply put, upon the date of transfer to the state, the U.S. was required to convey all federal interest in "rail properties of the Alaska Railroad." Rail properties were defined broadly as:

>[A]ll right, title, and interest of the United States to lands, buildings facilities, machinery, equipment, supplies, records, rolling stock, trade name, accounts receivable, goodwill, and other real and personal property, both tangible and intangible, in which there is

---

[1] Act of 1914, Section 1.

[2] 43 U.S.C. § 1601 *et seq.*

[3] Congressional Record-Senate, December 21, 1982, at p. S-15956.

Adolf Zeman, Jr.
January 8, 2019
Page 3

>    an interest reserved, withdrawn, appropriated, owned, administered or otherwise held or validly claimed for the Alaska Railroad by the United States or other agency or instrumentality thereof as of January 14, 1983. . . .[4]

As a consequence, Alaska received the *entire* federal interest in the ROW and, as discussed above, the U.S. owned fee simple title in most of the ROW when ARTA was enacted.

Two conveyance methods were specified for lands located outside Denali National Park. For surveyed land that was not subject to unresolved claims of valid existing rights (i.e. claims existing of January 13, 1983), the U.S. was required to deliver a patent to the state.[5] With respect to unsurveyed land not subject to unresolved claims, the U.S. was required to deliver an interim conveyance which "shall. . .convey to and vest in the state exactly the same right, title, and interest in and to the rail properties identified therein as the state would have received had it been issued a patent. . . ."[6]

With respect to lands that were subject to unresolved claims of valid existing rights, the U.S. was required to deliver to the state an exclusive license pending the adjudication of such claims. The exclusive license was subject only to leases, permits, and other instruments before the date of transfer and certain easements in favor of the U.S.[7] Once the claims were resolved, an interim conveyance was to be issued for that land—and eventually, the U.S. was required to issue a patent to the state.

ARTA also required the federal government to survey any remaining unsurveyed land that was initially conveyed by interim conveyance or exclusive license and to issue patents for that land. Surveys were completed for most of the ROW during the 1980's and 1990's and patents to that land began to issue. Only a few portions of the ROW remain to be conveyed by patent, but those lands are not related to the Enstar permit area.

ARTA also emphasized why Congress guaranteed *at least* an exclusive use easement with respect to all portions of the ROW:

>    The Congress finds that exclusive control over the right-of-way by the Alaska Railroad has been and continues to be necessary to afford sufficient protection for safe and economic operation of the railroad.[8]

---

[4] 45 U.S.C. § 1202(10).

[5] 45 U.S.C. §§ 1203(b)(1)(B); 1203(2).

[6] 45 U.S.C. § 1203(b)(3).

[7] 45 U.S.C. §1203(b)(4).

[8] 45 U.S.C. § 1205(b)(4)(A)(ii).

Adolf Zeman, Jr.
January 8, 2019
Page 4

Further underscoring congressional intent was a provision specifically requiring the federal government to defend the state's title in the ROW against claims that it had less than an exclusive use easement.[9]

The exclusive use easement that ARTA required to be conveyed to the state provides broad exclusive rights to the ROW:

> "[E]xclusive-use easement" means an easement which affords to the easement holder the following:
>
> (A) <u>the exclusive right to use, possess, and enjoy the surface estate of the land subject to this easement for transportation, communication, and transmission purposes and for support functions associated with a such purposes</u>;
>
> (B) the right to use so much of the subsurface estate of the lands subject to this easement as is necessary for the transportation, communication, and transmission purposes and associated support functions for which the surface of such lands is used;
>
> (C) subjacent and lateral support of the lands subject to the easement; and
>
> (D) <u>the right (in the easement holder's discretion) to fence all or part of the lands subject to this easement</u> and to affix track, fixtures, and structures to such lands and to exclude other persons from all or part of such lands.[10] (Emphasis added.)

ARTA therefore required the U.S. to convey to the State of Alaska, *at a minimum*, the exclusive right to use and occupy the ROW for transportation, communication and transmission purposes, and this included the right to exclude all other persons and entities from all or any of the ROW.

While it is true that the Alaska Railroad was the only railroad ever owned and operated by the federal government—and therefore the only railroad ever conveyed to a state by the federal government—it is important to emphasize that the exclusive use nature of a railroad ROW has long been recognized as settled law and consistent with important public policy concerns.

> A railroad under an easement for railroad purposes acquires the right of exclusive possession and most of the qualities of a fee title subject to the limitation that an easement must be used for railroad purposes.

---

[9] 45 U.S.C. § 1205(b)(4)(B).

[10] 45 U.S.C. § 1202(6).

*****

> It would seem to be true generally that a railroad right-of-way partakes more of the nature of an estate in fee than an easement. A railroad right-of-way includes the actual possession or the right to the actual possession of the entire surface for every proper use and purpose in construction and operation of the road.[11]

As stated by another commentator:

> Generally, after a railroad company's right of way has been located and constructed, it has the right to the uninterrupted and exclusive possession, use, and control of the surface of the land constituting its right of way and necessary for conducting its business. . . . As long as the railroad company occupies any portion of its right of way, it has the exclusive use and right of control coextensive with its boundaries.[12]

The U.S. Supreme Court and other courts have agreed with this interpretation. In *Western Union Telegraph Company v. Pennsylvania Railroad Company,* the Supreme Court stated:

> A railroad right-of-way is a very substantial thing. It is more than a mere right of passage. [A right-of-way] is more than an easement. . . . [I]f a railroad's right-of-way was an easement it was "one having the attributes of the fee, perpetuity and exclusive use and possession". . . .

*****

> A railroad's right of way has, therefore, the substantiality of the fee, and it is private property, even to the public, in all else but an Interest and benefit in its uses. It cannot be invaded without guilt of trespass. It cannot be appropriated in whole or part except upon the payment of compensation. In other words, it is entitled to the protection of the Constitution, and in the precise manner in which protection is given.[13]

---

[11] G. Thompson, Commentaries on the Modern Law of Real Property (1965), §381 at 503, 512.

[12] 74 C.J.S. Railroads § 225 (2002) (footnotes omitted). *See also* 65 Am.Jur.2d, Railroads, §104, at 403 (Railroad right-of-way easement is essentially different from any other in that it requires exclusive occupancy).

[13] 195 U.S. 540, 570 (1904); *see also Wyoming v. Udall,* 379 F.2d 635, 639 (10th Cir. 1967) (explaining that railroad easements included, "so far as railroads are concerned, a right in perpetuity to exclusive use and possession . . . ."); *State v. Oregon Shortline Railroad Co.,* 617 F. Supp. 207, 210 (D. Idaho 1985) (Federally-granted railroad rights-of-way entitle railroads to

The basis for the exclusivity of a railroad easement, even where a separate underlying fee owner is present, lies in the nature and risk of railroad operations:[14]

> The inherent risk facing trespassers around the operation of railroad tracks precludes any safe uses of the land available to the landowner holding the underlying fee. The danger to a trespasser from a fast-moving train, lacking the ability to stop suddenly, is the basis for the exclusivity of use. An easement for a railroad right-of-way differs in important respects from other easements, [in] that the right of possession of the right-of-way is exclusive in the railroad.[15]

To summarize, while the inception of the Alaska Railroad and its eventual transfer to the State of Alaska may have been unique, the ROW conveyed by the federal government to the state was anything but. Instead, ARTA *required* the transfer of all the rail properties in fee simple or, at a minimum, an exclusive use easement which meant "the exclusive right to use, possess and enjoy the surface estate of the land subject to. . .transportation, communication, and transmission purposes and for support functions associated with such purposes." ARTA required this interest to be conveyed by the federal government because it explicitly recognized that "exclusive control over the right-of-way by the Alaska Railroad has been and continues to be necessary to afford sufficient protection for safe and economic operation of the railroad."[16]

It is worth emphasizing that in the Legislative Findings and Purpose which accompanied the passage of the Alaska Railroad Corporation Act by the Legislature, it was resolved that "it is in the state's best interest to accept the railroad under the terms and conditions offered by the United States government." Further, the Legislature found that it was appropriate to create a public corporation "with the powers, duties, and functions needed to operate the Alaska Railroad" in order to, among other things, "preserve the integrity of the railroad utility corridor for transportation, communication, and transmission purposes."

---

the exclusive use and occupancy of those rights-of-way, which is necessary for railroads to function); *cf. Vieux v. East Bay Regional Park Dist.*, 906 F.2d 1330, 1333 (1990) (referring to post-1871 federal railroad rights-of-way as "exclusive use easements"); *Union Pacific R.R. v. Santa Fe Pacific Pipelines*, 231 Cal.App. 4th 134, 163 (Cal. Ct. App. 2014) ("As to rights-of-way granted by Congress in 1875 and beyond, the Railroad has exclusive rights to the surface and, in addition, 'broad and extensive rights of sub-lateral and subjacent support to prohibit interference with railroad operations and maintenance.'").

[14] The railroad operating environment is inherently a hazardous one. Trespassing along railroad rights-of-way is the leading cause of rail-related fatalities in America, resulting in approximately 500 deaths each year.

[15] Jeffrey M. Heftman, Railroad Right-of-Way Easements, Utility Apportionments, and Shifting Technological Realities, 2002 Univ. of Illinois Law Review, Vol. No. 5 at 1409 (citing cases).

[16] 45 U.S.C. § 1205(b)(4)(A)(ii).

While the Alaska Railroad Corporation has faced many challenges during its short history, I am not aware of any legal challenge to ARRC's exclusive use easement and those segments of its ROW which are not owned in fee simple.

## HB 119

In order to understand HB 119, it is necessary to discuss ARRC's ill-fated Residential Right-of-Way Use Policy (RRUP), a program in which ARRC invested a great deal of time and effort, but a policy which was ultimately abandoned. RRUP was a program designed to balance ARRC's exclusive interest in its ROW with many adjoining land owners who have facilities or improvements that encroach upon the ROW. After some initial tweaking, it was *not* designed to eliminate these various uses, but it involved an annual fee which would be used by the railroad to accommodate existing uses provided they were compatible with railroad safety and operation. ARRC engaged in community outreach, including door-to-door solicitations, meetings with community councils, and so on. The program was revised several times in response to the feedback it received, and then re-noticed for additional public input. After a multi-year process, it was adopted by ARRC's board in November 2013. While some affected landowners were never satisfied, there was nonetheless acknowledgement by many members of the public that ARRC was sincere in its good faith efforts to accommodate the various concerns which had been raised.

But there continued to be naysayers and they continued their campaign. In their view, the railroad's easement was no different than any other easement running on their property, and they had the unfettered ability to use that easement provided it did not interfere with railroad operations—a judgment they left to themselves.

I met with some of these representatives on at least one occasion while I was Attorney General, and I believe they also reached out to the governor's office and the legislature.

While one could question the wisdom of RRUP from a public relations perspective, we believed after researching the Railroad's position that it was legally sound. I left the government, but apparently several legislators picked up the cudgel. In the meantime, the Railroad's board decided to abandon the RRUP program in January 2018 but, in the category of no-good-deed-goes-unpunished, the Legislature passed HB 119 in its waning hours last summer.

HB 119 makes several changes to AS 42.40 et *seq.*, the Alaska Railroad Corporation Act. I believe two are relevant to the Notice of Breach initially sent to Enstar by ARRC in its letter dated October 11, 2018, to which Enstar responded by means of Ben Spiess's letter dated November 13, 2018. AS 42.40.350(a) has been amended to read that ARRC shall take title to all rail property transferred pursuant to ARTA "except that the corporation does not have authority over any right, title, or interest in property transferred under this subsection that was not vested in the United State at the time of transfer."

Similarly, AS 42.40.410 authorizes ARRC to accept additional federal lands in the future that will enhance the railroad's operations. "In this section, land or interest in land that is not conclusively owned by the United States at the time of transfer is not available and does not satisfy the exception from legislative approval. . . ."

At the outset, I question whether these new provisions have any real, legal effect. Obviously, the federal government must have had "authority over any right, title, or interest in property" at the time it is transferred, or otherwise there would have been nothing to transfer. Stating that the federal government "does not have any authority over any right, title, or interest in property transferred. . .that was not vested in the United States at the time of transfer" is a tautology—and one of no legal effect. Based upon my personal experience, I do not believe the Department of Law would have stood by and allowed passage of any legislation that might impair title to the Railroad's ROW—or any other interest belonging to a state agency. That is part of their job during the legislative session.

Moreover, I question whether any *state* legislature can, decades after the fact, unwind, or cast doubt upon, a *federal* conveyance.

It seems to me that in determining the scope of any conveyance of real property, or an interest in real property, the grantor's intent will be given a great deal of weight. It bears emphasis that ARTA *required* the U.S. to convey, *at a minimum,* an exclusive use easement for the ROW. Further, "if an action is commenced against the State or the United States contesting the validity or existence of a reservation of right-of-way for the use or benefit of the Alaska Railroad. . .the Secretary of the Interior, through the Attorney General, shall appear in and defend such action."

The naysayers may never go away, and perhaps a legal challenge will be posed someday. When I met with some of the affected land owners—a number of whom were well heeled—I encouraged them to file a legal challenge so everyone would have the benefit of a court ruling, but of course that never happened. In the meantime, I was confident in the legal analysis prepared by the Department, for the reasons expressed in this letter. Unless and until there is a successful legal challenge, and a court is somehow convinced that the federal government did not implement what Congress expressly required it to do when it passed ARTA, I will continue to advise ARRC that they have legal and enforceable agreements with entities operating utilities and pipelines within the ROW—and that includes Enstar.

If you have any questions or comments about the contents of this letter, please feel free to reach out. Otherwise, if Enstar still wishes to meet we trust you will get back to us with a request and some proposed dates when your client is available. Thanks for your consideration.

Sincerely,

OLES MORRISON RINKER & BAKER LLP

Michael C. Geraghty

MCG:snu

cc: Andrew Behrend

4811-0442-9698, v. 1