Thomas E. Meacham, Attorney at Law
Alaska Bar Assn. No. 7111032
9500 Prospect Drive
Anchorage, Alaska 99507
Tel: (907) 346-1077
Email: tmeacham@gci.net

*Attorney for amicus curia Matanuska
Telecom Association, Inc*.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA RAILROAD CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | |
| ) | |
| FLYING CROWN SUBDIVISION ) | |
| ADDITION NO. 1 AND ADDITION ) | Case No. 3:20-cv-00232-JMK |
| NO. 2 PROPERTY OWNERS ) | |
| ASSOCIATION, ) | **BRIEF *AMICUS CURIA*** |
| ) | **OF** |
| Defendant, ) | **MATANUSKA TELECOM** |
| ) | **ASSOCIATION, INC.** |
| MUNICIPALITY OF ANCHORAGE, ) | |
| Intervenor- ) | |
| Defendant ) | |

Matanuska Telecom Association, Inc., formerly Matanuska Telephone Association, Inc., and including its wholly-owned subsidiaries MTA Communications, LLC, and MTA Fiber Holdings, LLC (collectively, "MTA"), through its counsel Thomas E. Meacham, Attorney at Law, files this brief *amicus curiae* pursuant to the Court's Order of July 22, 2021 [Docket 74].

MTA's *AMICUS* BRIEF
*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK   Page 1 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 1 of 19

## I. INTRODUCTION.

MTA in this *amicus* filing will endorse and adopt legal positions already asserted by named defendants Flying Crown Property Owners Association ("Flying Crown") and the Municipality of Anchorage, and arguments expressed earlier by co-*amicus* participant ENSTAR, all responding to the assertions made by plaintiff Alaska Railroad Corporation ("ARRC") in its Complaint and its summary judgment briefs.

Matanuska Telecom Association, Inc. is a cooperative corporation that was originally formed under applicable Alaska territorial and state statutes, beginning in 1953. MTA installs, operates and maintains 6,600 miles of communications lines and related facilities most of them installed from Eagle River, Alaska northward along and through the "Railbelt" area of southcentral Alaska to Fairbanks, Alaska.[1] MTA presently has some 32,000 individuals and businesses who are its member-owners. *Id*.

Like the situation presented by *amicus* participant ENSTAR, MTA's central point of contention with ARRC -- heightened by the dispute between plaintiff and defendants in the present action -- arises from how ARRC administers the lands within its railroad right-of-way easement for uses that are not necessary for -- and are not related to -- ARRC's acknowledged, rightful function of running its railroad. ARRC's believes that it

---

[1] Docket 43 (Declaration of Eric Anderson), and Docket 43-1 Exhibits, pp. 1-25.

MTA's *AMICUS* BRIEF
*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK  Page 2 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 2 of 19

has the legal right under the 1914 Alaska Railroad Act (the "1914 Act")[2] and the 1982 Alaska Railroad Transfer Act ("ARTA")[3] to administer all lands within its reserved right-of-way easement as a discrete and distinct profit center, a source of market-value revenue unrelated to the lands it actually occupies for the running of its railroad. This position is not supported by either ARTA or its predecessor 1914 Act. ARTA's asserted right to manage its right-of-way lands in this manner for non-railroad uses stems from its interpretation of the "exclusive-use" easement provision in ARTA, and its claimed implied presence in the 1914 Act.

Unlike *amicus* participant ENSTAR, MTA does not own utility lines or installations within or near the Flying Crown and municipal lands that are directly affected by ARRC's claimed "exclusive-use" real-property authority in the present litigation. ARRC's claims against Flying Crown and the Municipality (and by implication involving *amicus* ENSTAR's relationship with ARRC) specifically involve the former Sperstad homestead tract and other lands in the immediate vicinity, as to which ARRC claims exclusive-use rights under its interpretation of ARTA and the 1914 Act.

---

[2] Alaska Railroad Act of 1914, 28 Stat. 305 (formerly codified at 53 U.S.C. 975 *et seq.*, and prior to statehood, at 48 U.S.C. 301 *et seq.*, repealed January 14, 1983 by the Alaska Railroad Transfer Act ("ARTA"), Pub.L. 97-468, Sec. 615(a)(1), 96 Stat 2577.

[3] 45 U. S. C. Sec 1201, *et seq*.

MTA's *AMICUS* BRIEF
*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK          Page 3 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 3 of 19

However, MTA's *amicus* brief will demonstrate the extent to which ARRC's present legal position, as expressed in this litigation, directly and adversely affects a considerably larger universe of parties suffering harm from ARRC's surface-use policies than those who are presently parties to this lawsuit. In MTA's particular situation -- as a public utility with lines and facilities installed adjacent to, across, and throughout ARRC's railroad tracks in the Railbelt area from Eagle River northward to Fairbanks -- it is presently facing, and will suffer, severe financial hardship to its member-ratepayers if ARRC's surface-use legal position were found to be valid and applicable system-wide[4]. As the defendants and *amicus* ENSTAR have already done, MTA will offer relevant authority and argument as to why ARRC's "exclusive-use" interpretations of the 1914 Act and ARTA are not valid.

In particular, ARRC's claim that "exclusive-use" easement ("EU") authority was an implied but integral part of the federal Alaska Railroad's original easement reservation authority from 1914, and has merely continued as an explicit EU in ARTA after 1992, will be analyzed and refuted by citations to applicable cases and contemporaneous testimony before a Congressional committee.

---

[4] Declaration of Eric Anderson *id*. [Docket 43], and Docket 43-1 Exhibits, pp. 1-25.

MTA's *AMICUS* BRIEF
*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK     Page 4 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 4 of 19

## II. ARRC'S CLAIM THAT "EXCLUSIVE USE" CONVEYANCE AUTHORITY APPLIES TO ALL LAND TRANSFERS MADE UNDER ARTA IS IN ERROR.

Flying Crown, the Municipality and *amicus* ENSTAR have in their filed briefs explained how the structure of ARTA simply does not support an interpretation that would grant authority for ARRC to receive all conveyances and patents of the "rail properties of the Alaska Railroad" with a universally-applicable EU provision attached. With MTA's brief discussion here, and without unnecessary repetition, MTA will show its support for a judicial finding that the application of EU authority under ARTA is quite limited, and is controlled by how ARTA itself is structured. From the layout of the Act, and the specific statutory sections and sub-sections in which "exclusive-use" authority is stated, it should become clear that EU under ARTA is not a universal conveyance parameter -- far from it.

The "entirely new" concept of EU (as Sen. Ted Stevens had described it)[5], merited a specific definitional subsection in the "Definitions" Section of ARTA; *see* ARTA, 43 U. S. C. Sec. 1202(6). Then in the body of the Act itself, it is mentioned only a few times -- and always in those provisions of ARTA dealing with "unresolved claims of valid existing rights" and their adjudication, including pending Native land claims,[6] and in the provision

---

[5] 128 Cong. Record S15885 (daily ed. Dec. 21,1982), as cited in Docket 94 at 3, fn. 6.

[6] ARTA Sec. 1205(b).

dealing with the railroad right-of-way through Denali National Park.[7]  All of these references involve federal public lands lands whose fee interest was, at the time of ARTA's passage, still owned by the United States.

The important legal consequence of this continuing, underlying federal fee ownership at the time of ARTA is this: Congress in ARTA was free to enlarge (or diminish) the contents of the real-property "bundle of sticks" that it would require to be transferred to the new state railroad, without triggering any uncompensated Constitutional takings implications.  The same cannot be said of the ARTA transfers to the state railroad of existing federal properties, easements and rights across earlier-patented lands (such as the Sperstad homestead in this case), whose fee interest had long since been conveyed out of federal ownership, and subject to the 1914 Alaska Railroad reservation that was universally applicable to patents of federal lands from 1914 to 1982.  Congress in ARTA only enlarged the "bundle of sticks" to be transferred to the State in the case of unresolved Native  land claims on federal lands, and in the Denali National Park right-of-way, by mandating that the transfer was to be with an "exclusive-use easement"  condition on title.  Earlier-patented lands were not (and Constitutionally could not be) affected by a Congressional increase in the quantity of "sticks" to be transferred to the state railroad.

---

[7] ARTA Sec. 1203(b)(1)(D), as amended by Subsec. (d)(2))D), Pub.L.108-447 (2004) and Subsec. (b)(1), Pub.L.108-7 (2003).

MTA's *AMICUS* BRIEF
*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK   Page 6 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 6 of 19

A close examination of ARTA -- which must be undertaken in order to correctly ascertain just how limited are its mandated EU provisions -- finds that without question, EU applies to the railroad right-of-way through Denali National Park. *Id*. The only other section of ARTA that required the grant of EU authority to the state-owned railroad in conveyances under ARTA is Sub-section 1205(b). The title of that Sub-section limits the application of provisions under it to the "*Review and settlement of claims*, administrative adjudication process; management of lands; procedures applicable." [Emphasis supplied].

Clearly, this sub-section cannot provide authority for the universal inclusion of EU authority in conveyances to be issued to ARRC *on previously-patented lands, where, by definition no "unresolved claims of valid existing rights" can be involved*.[8] It appears from available information that commencing with the initial federal-state transfer procedures, ARRC (with the assistance and concurrence of the U. S. Department of the Interior and its Office of the Regional Solicitor) was able to obtain the inclusion of virtually universal "EU authority" in interim conveyances and patents issued to it -- notwithstanding the statutory limits on the application of EU authority to Denali National Park and unresolved claims of valid existing rights that are clearly contained in the structure and the specific terms of ARTA.[9]

---

[8] *See* Docket 94, p. 16, fn. 45.

[9] *Peter Slaiby, et al.,* IBLA 2014-17, Interior Board of Land Appeals (2015).

MTA's AMICUS BRIEF

*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK  Page 7 of 19

Briefly stated, the various subsections under ARTA that involve "unresolved claims of valid existing rights" and their administrative adjudication[10] are all limited and confined to subsections under the main Section 1205.[11] The subject of ARTA's main subsection 1205(b) involves only unresolved claims of valid existing rights on unpatented federal lands, arising primarily from then-unresolved Native land claims.

### III. CONTEMPORANEOUS TESTIMONY IN CONGRESS REBUTS ANY CLAIM THAT THE 1914 ACT CONTAINS IMPLIED "EXCLUSIVE-USE" EASEMENT AUTHORITY.

**A. The Contribution of the 1898 Alaska Railroad Act to the 1914 Act and its Implementation was Significant.** Flying Crown's Brief in Support of Summary Judgment [Docket 85] and its Reply Brief [Docket 94] have emphasized, through U. S. Supreme Court case law, the conscious Congressional departure from its pre-1875 method of financing the construction of railroads across federal public lands with generous land grants to the railroads, thereby creating a separate profit center for these railroads, one that was only tangentially related to the actual building and running of the railroads themselves.[12] *Great Northern* and *Brandt* had held generally that after

---

[10] As Flying Crown pointed out in its brief [Docket 82, pages 26-33 and fn. 92; and Docket 94, page 16, fn. 45], patents for lands conveyed out of federal ownership are no longer subject to the administrative jurisdiction of the Department of the Interior or its Secretary. This legal doctrine confines ARTA Sec. 1205(b) and its subsection (b)(2) to unpatented lands only.

[11] *See, e. g.*, §§ 1205(b)(1)(A); 1205(b)(1)(B)(2)-(4)(B).

[12] *Great Northern R. Co. v. United States,* 315 U. S. 262, 271, 62 S. Ct. 529, 532, 86 L. Ed 836 (1942); *Marvin M. Brandt Revocable Trust v. United States*, 572 U. S. 93, 104, 134 S. Ct. 12576, 1265, 188 L. Ed.2d 272 (2014).

enactment of the General Right-of-Way Act of 1875,[13] the easement grant across federal public lands was interpreted to be a simple common-law easement for railroad uses -- *not* fee ownership of the railroad easement lands.  (Its near-fee equivalent "exclusive use" authority is, as the defendants contend, equally unsupportable under the doctrines of *Brandt* and *Northern Pacific)*.

In Flying Crown's analysis of the 1914 Act to determine whether it contained any vestiges of pre-1875 federal railroad grants, or any hints of an implied EU easement authority, the documented origins of the federal Alaska Railroad's main-line trackage from Seward to Fairbanks, and north to Chatanika, were reviewed.  As discussed at pages 17-19 of Flying Crown's summary judgment brief [Docket 82] and at pages 12-15 of its reply brief [Docket 94],   the new federal Alaska Railroad had, at the outset, acquired significant constructed track miles and route surveys from two existing, private Alaskan railroads, the Alaska Central RR and the Tanana Valley RR.

The acquisition by the new federal railroad of these pre-existing railroads' rights comprised 116 constructed rail miles -- or approximately 23% to 24% of the  entire federal Alaska Railroad's eventual main-line track length.   [Docket 82, at pp. 19-20, Docket 94 at pp. 12-15].   Both of these earlier railroads had acquired their easement rights under authority of the 1898 Alaska Railroad Right-of-Way Act.[14]   This fact

---

[13] Act of March 3, 1875, 18 Stat. 482, codified at 43 U.S.C. 934-939.

[14] Act of May 14, 1898, Ch. 299, 30 Stat. 409, as amended by Act of June 15, 1938, Ch. 437, 52 Stat 699, 48 USC §§ 411-419, 421, 423.

MTA's *AMICUS* BRIEF

*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK                    Page 9 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 9 of 19

becomes significant when testimony is reviewed that had been presented to the U. S. Senate's Alaska Railroad Committee before the 1914 Act became law. As Flying Crown's summary judgment briefs had emphasized, no statutory distinction is found (or even implied) in the 1914 Act between the track right-of-way easements that would be acquired by the new federal railroad from the two pre-existing private railroads originating under the 1898 Act, and the exercise by the federal railroad of the new easement rights granted it under the 1914 Act.

This absence of any statutory distinction between the sources of the two grants or reservations of Alaskan railroad rights-of-way (by the 1898 Act and 1914 Act) is significant when a particular provision of the 1898 Act, at Sec. 2, is examined. This provision specifically disavows any transfer to a railroad of the fee interest in any railroad easement granted across federal lands by the 1898 Act:

> *Provided*, That nothing herein contained shall be so construed as to give to such railroad company ........the ownership or use of minerals, including coal, within the limits of such right of way, *or of the lands hereby granted*:.....

Sec. 2, Ch. 299, 230 Stat. 409 [Emphasis supplied].

When reviewing this provision in the context of the origin of nearly one-quarter of the federal Alaska Railroad's main-line track length, and with the absence of any distinction between the terms and conditions of the 1898-grant lands that were incorporated by purchase into the new federal railroad and the exercise of easement

MTA's *AMICUS* BRIEF

*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK  Page 10 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 10 of 19

reservations made by the 1914 Act itself, it must be concluded that there can be inferred no "implied fee" or implied near-fee "exclusive-use" provision in the 1914 Act.

**B. Congressional Testimony Supports the Absence from the 1914 Act of a Federal Land Component that Could be Held and Managed for Purposes not Directly Related to Railroad Operations.**

MTA, as an *amicus* participant, offers copies of relevant excerpts from extensive contemporaneous testimony given before the U. S. Senate's Alaska Railroad Committee in 1913 concerning pending Senate bills, S . 48 and S. 233, which formed the basis for the 1914 Act in the next year. These excerpts from committee hearings supplement the excerpts of the testimony from the Congressional Record that have been cited as Appendix A to Flying Crown's Reply at Docket 94, pages 10-11 and footnotes 30-35.

At various times during the Senate Committee hearings that preceded the floor debate on the 1914 Act, members of Congress and those testifying before it acknowledged the decisive departure, the clean break, that both the 1875 General Railroad Right-of-Way Act and the 1898 Alaska Railroad Right-of-Way Act had already made from the method used by the United States, prior to the 1875 Act, to authorize and

MTA's *AMICUS* BRIEF

*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK  Page 11 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 11 of 19

incentivize the right to obtain, use and sell federal lands to finance railroads.[15] The effects of this clean break were directly explained and discussed ln the *Brandt* and *Great Northern* decisions.

It is plain from the Senate hearings that preceded the 1914 Act that the public land right-of-way concepts contained in the bills which eventually became that Act were the direct progeny of the 1875 and 1898 Acts; the only significant differences were the methods of financing and ownership (by private entities in the two earlier Acts, and by the federal government in the 1914 Act). The excerpted statements from the 1913 Senate Committee hearings follow:

> Statement of JAMES WICKERSHAM: "That you may have a fair view of the railway laws now in force in Alaska, I call your attention to the act of May 14, 1898, passed by Congress.....I will put into the record at this point, f the committee

---

[15] This compilation is comprised of the statements and testimony of Judge James Wickersham, Alaska's Delegate to Congress; Falcon Joslin, builder of the Tanana Valley Railroad; Richard S. Ryan, President of the Controller Railway & Navigation Co., Controller Bay, Alaska; and Walter L. Fisher, former Secretary of the Interior. Each statement is excerpted from the 718-page printed U. S. Government volume, *Construction of Railroads in Alaska,* which contains the complete statements and testimony from which these excerpts have been drawn.

The referenced volume contains Parts 1 through 11, and Addenda and an Index, regarding the hearings that began on May 2, 1913, and concluded on May 23, 1913, in the Sixty-third Congress, First Session before the Committee on Territories, United States Senate. These hearings were on the pending Alaska railroad bills S. 48 and S. 133. Each excerpted statement is identified by the name of the speaker and the pages in the volume in which the statement appears. If the Court wishes to examine any materials not reproduced, or any context not apparent from the excerpted testimony, *amicus* MTA can make the entire original volume available for its review.

MTA's *AMICUS* BRIEF

*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK   Page 12 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 12 of 19

will permit me, a copy of that act, and without reading it to you in full at this time, I will say that there is not, in my judgment, anywhere in the United States territory more power granted to railroads, to private individuals, to private corporations, nor is ampler power granted to build railroads anywhere in the United States Territory than Congress has already granted in Alaska. The law of 1898 inviting railway building in Alaska is as follows: [1898 Act follows]."

"In short, Gentlemen, we have in Alaska a complete railway law passed by Congress giving private interests, private individuals and corporations complete authority, right and power to build railroads, granting them rights of way and terminal facilities, giving them everything that is necessary except Government aid. It is as good a law in that respect as you have in any State or Territory in the United States, probably better."

"We have power to build railroads in Alaska.....but after the President of the United States in 1906 withdrew all the coal lands in Alaska, every incentive for building railroads was taken away, and all railroad building was stopped."

    -- from 1913 Hearings, *Construction of Railroads in Alaska,* pages 9-12.

Testimony of FALCON JOSLIN, Fairbanks, Alaska: "....I have studied the manner in which the Government aided the Union Pacific Railway, by which the Government aided the Northern Pacific Railroad, and by which the Government has recently aided the railroads in the Philippine Islands; also the system by which the Canadian Government is aiding the roads in their territories. And I have also studied somewhat the very recent plans by which the cities of New York and Chicago have brought about the construction of new subways and street railways. The principle in those recent cases in New York and Chicago, in my judgment, s the wisest one to adopt. The Union Pacific, you know, was a grant by the Government of one-half of the land for 10 miles on each side of the track as a gift.
SENATOR NELSON: It was more than that.
MR. JOSLIN: Perhaps it was 20 miles.
SENATOR NELSON: Then they got a money subsidy besides.
MR. JOSLIN: No sir, I beg your pardon; it was a loan. In addition to the land grant the Government loaned to the Union Pacific the National Government's bonds, 6 per cent bonds -- not the railroad's bonds....."

    -- from 1913 Hearings, *Construction of Railroads in Alaska,* , pages 62-63.

Testimony of FALCON JOSLIN (continued): "Practically all their [Canadian] new roads through the West have been granted a cash subsidy of one kind or another. They have quit granting land subsidies. Land subsidies are not a good way of aiding a railroad.
SENATOR NELSON: Land subsidies would be of no earthly use in Alaska.
MR. JOSLIN: You cannot realize on it... And in Alaska a land grant would be practically useless." .....

"MR. JOSLIN: But a land grant is a poor form of aid. The Canadians do not do it anymore."

    -- from 1913 Hearings, *Construction of Railroads in Alaska,* pages 69-70.

Statement of WALTER L. FISHER, Former Secretary of the Interior: "In the past we have made land grants and we have given other assistance to railroads. I think that time has definitely gone by. I do not believe that Congress is going to make any more land grants in aid of railroads. I think we are all pretty clearly of the opinion that that if a railroad needs and ought to have, Government aid, we ought to have the government make the necessary financial expenditure and make it directly. Indirection always means that the public pays several times over for what it gets....."

    -- from 1913 Hearings, *Construction of Railroads in Alaska,* page 135.

Statement of RICHARD S. RYAN, President of Controller Railway & Navigation Co., Controller Bay, Alaska: "Now, a few words on the policy of the bill. I am of the same firm opinion now as I was in 1906 -- that railroad building of transportation lines with and through the assistance of the Government is necessary in Alaska -- in spite of what some gentlemen say, that if this bill were passed Government construction would immediately flood the country. I do not think so. There is no use running away with the thought that Government money is going to be spilled into Alaska. Private capital, on the other hand, would follow the investigations of the resources and tonnage, and there is no question in my mind would supply the money and keep on building.
SENATOR JONES: Do you think it would not without the assistance of the Government?
MR. RYAN: If the resources are released, Senator, it will; but it will not be as rapid as if the Government assisted.
THE CHAIRMAN: You mean by the assistance of the Government in what way?

MR. RYAN: That is the question. It was discussed to some extent by Mr. Joslin. We are satisfied that the day of land grants has gone by. With land grants out of the question, we have nothing left but some form of financial assistance, such as guaranteeing of bonds or cash subsidy.

    -- from 1913 Hearings, *Construction of Railroads in Alaska,* pages 199-200.

Memorandum of FALCON JOSLIN, Chairman Alaskan Committee of the American Mining Congress (supplement to Mr. Joslin's statement of May 3, 1913, and inserted in the record at the request of the committee):
"The Land Grants to Pacific Railroads. In 1862 and 1864 the Government, by acts of Congress, provided for the extension of two trunk-line railroads through its undeveloped western Territories -- one, the Union-Central Pacific, from the navigable waters of the Missouri to the Pacific Ocean at San Francisco, and the other, the Northern Pacific, from the Great Lakes to Puget Sound. It granted to the Northern Pacific a free gift of 12,800 acres of land, including the coal, for each mile of track it constructed. The grant to the Union Pacific was 6,400 acres for each mile, and in addition, the Government loaned to the companies undertaking the line the 30-year 6 per cent bonds of the United Stats to an average amount of $23,000 for each mile constructed. In Alaska the Government offers no gift of lands or loan of capital to railroads. It prohibits even the purchase of coal lands on any terms by anyone. The railroads cannot mine fuel for their own use......"

"Land Grants not Desirable Aid. A land grant in aid of railroads in Alaska is not to be considered. Public opinion would never support it. Rightly or wrongly, the public has long believed the land grants to the Pacific railroads were not improvident. Moreover, a land grant is a very poor form of aid. The land has very little value at first, and can only be sold gradually and upon long-time payments. It is nearly useless as security for a loan of capital. What a railroad needs in its beginning is aid that will enable it to raise immediate ash. However generous a land grant may be, it takes years to realize on it, These objections to a land grant would have peculiar force in Alaska, where settlement and increase in land value must be much slower than it was in the West......."

    -- from 1913 Hearings, Construction of Railroads in Alaska, pages 270, 283.

MTA's *AMICUS* BRIEF

*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK      Page 15 of 19
Case 3:20-cv-00232-JMK    Document 97    Filed 10/04/21    Page 15 of 19

It is clear from these excerpts that no legitimate, substantiated inference may be drawn from the later-enacted 1914 Act that it contained unspoken, undocumented (and yet somehow implicit) authority for the federal Alaska Railroad to use its reserved railroad easements -- land interests not occupied by the physical construction and operation of the Railroad -- as a separate source of market-value-based revenue for the Railroad. Yet, after receiving the federal railroad's property assets and rights under ARTA, this is what ARRC is attempting to do, using its claims of implied EU in the 1914 Act, and the very limited direct EU authority in ARTA, as its legal cover.

**IV. ARRC'S USE OF ITS ENTIRE RIGHT-OF-WAY, INCLUDING THE SUBSURFACE UNDERLYING ITS RAILROAD EASEMENT, AS A PROFIT CENTER AND REVENUE SOURCE HAS ADVERSELY AFFECTED MTA IN PARTICULAR AS TO MTA'S SUBSURFACE TELECOM INSTALLATIONS.**

The Declaration of MTA's Eric Anderson [Docket 43] and its Exhibits A through G [Docket 43-1] contained assertions that a total of 114 MTA telecom crossings of the ARRC right-of-way, and 188,000 linear feet of MTA's telecom lines located within the ARRC right-of-way, were being assessed and charged by ARRC at approximately $245,000.00 *per year*, at ARRC's stated fee schedule of $1.00 per linear foot and $500 per crossing. Docket 43-1, p. 7. It is clear that apart from its railroad operations, ARRC is taking steps to monetize the entirety of its reserved easement not directly for rail purposes, but instead as a commercial landlord would use it, with lands and access for lease or rent for a variety of non-railroad uses. Under the recent *LKL Associates* case

MTA's *AMICUS* BRIEF
*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK  Page 16 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 16 of 19

directly on point,[16] this is not a lawful use of federal railroad-easement lands. It is instead the rental or leasing of railroad easements for uses unneeded by and unrelated to railroad operations, and as for which the railroad lacks statutory authority. MTA asserts that this limitation of authority is equally applicable under the 1875 Act, the 1898 Act, and the 1914 Act.

MTA has since refined its review of its telecom facilities and their relation to ARRC easement lands. Its additional figures show that the vast majority of MTA's interface with the ARRC's 1914 easement are facilities installed underground, where the asserted extension of ARRC's surface easement for railroad operations is even more legally tenuous.[17]

The present extent of MTA's subsurface telecom lines in relation to ARRC's right-of-way easement under the 1914 Act and ARTA is shown by the following chart, which is current as of September 15, 2021:

---

[16] *LKL Assoc., Inc. v. Union Pacific RR. R. Co.*, 2018 WL 2433563, at *5 (D. Utah, May 29, 2018) (appeal pending).

[17] MTA acknowledges that it owes ARRC's surface installations for its railroad uses the duty of non-impairment of subjacent and lateral support. This is both a common-law duty implicating strict liability, and a statutory one if lands subject to ARTA's EU easement are involved (*see, e.g., State Farm Fire & Casualty Co. v. Municipality of Anchorage*, 788 P.2d 726, fn. 6 p. 731 *(citing 6A A. J. Casner, American Law of Property* §28.36-.54 (1952) ;ARTA, 45 U. S. C. Sec. 1202 (6)(C)).
After coordinating the installation of MTA's buried telecom installations with ARRC, the subsurface extent of MTA's lines installed across or parallel to ARRC's tracks is asserted to be so miniscule and incidental that any question about an actual compromise of ARRC's subjacent and lateral support for its surface facilities is very unlikely to arise.

MTA's *AMICUS* BRIEF

*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK  Page 17 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 17 of 19

MTA Overhead vs. Underground Telecom Installation Footage in ARRC Right-of-Way:

| Name | Overhead Total | Underground Total | TOTAL Footage in ARRC |
|---|---|---|---|
| MTA | 13,920' | 163,109' | 177,029' |
| MTA with Healy Reserve | 0 | 72,373' | 72,373' |
| MTA Fiber Holdings, LLC | 17,632' | 230' | 17,862' |
| | | | |
| **TOTAL** | **31,552'** | **235,712'** | **267,264'** |

It is clear that the vast majority of MTA's interface with ARRC, some 87 percent, involves its buried telecom installations underlying ARRC's surface easement for railroad purposes.

As to the subsurface estate in particular, ARRC's exercise of its surface easement rights for railroad purposes under the 1914 Act and ARTA (aside from protection against impairment of subjacent and lateral support) cannot lawfully be extended downward by simple implication, under these Acts. ARRC's railroad easement authority has no identifiable component that would allow it to encompass its leasing or rental to public utilities of the servient landowner's retained subsurface estate, for the Railroad's own revenue-generating purposes.

Consistent with the holding in *LKL Associates*, *id.*, ARRC's leasing of portions of its surface right-of-way easement not involved in its actual railroad operations, as well as

its leasing of the subsurface underlying its surface easement, must be disallowed, as the exercise of a claimed property right or prerogative not granted to it by the 1914 Act or by ARTA on previously-patented lands.

## V. CONCLUSION.

MTA submits this brief *amicus curia* in support of the legal positions taken by defendant Flying Crown and intervenor-defendant Municipality of Anchorage, regarding the correct legal interpretations to be given the 1914 Act and ARTA and their application, as expressed by these defendants in their summary judgment briefing on ARRC's summary judgment motion and the defendants' responses and cross-motion.

Dated at Anchorage, Alaska this 4th day of October, 2021.

By __/S/ Thomas E. Meacham_____
Thomas E. Meacham, Attorney at Law
Alaska Bar No. 7111032
Counsel for *Amicus Curia*
Matanuska Telecom Association, Inc.

CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2021, I filed a true and correct copy of the foregoing document with the Clerk of Court for the United States District Court – District of Alaska by using the CM/ECF system. All participants in Case No. 3:20-cv-000232-JMK are registered CM/ECF users who will be served by the CM/EFC system.

____/S/ Thomas E. Meacham____
Thomas E. Meacham, Attorney at Law

MTA's *AMICUS* BRIEF
*Alaska Railroad Corp. v Flying Crown*, Case No 3:20-cv-00232-JMK    Page 19 of 19
Case 3:20-cv-00232-JMK   Document 97   Filed 10/04/21   Page 19 of 19